UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------

JASON MORANO,

                Plaintiff,

       v.

ZYNGA INC., MARK PINCUS, FRANK
GIBEAU, REGINA E. DUGAN, WILLIAM
BING GORDON, LOUIS J. LAVIGNE JR.,
CAROL G. MILLS, JANICE M. ROBERTS,
ELLEN F. SIMINOFF, and NOEL WATSON.

                Defendants.

Case No. 1:22-cv-03084

**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Jason Morano ("Plaintiff"), by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## NATURE OF THE ACTION

1.      This action is brought by Plaintiff against Zynga, Inc. ("Zynga" or the "Company") and the members of the Company's Board ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of Zynga Stockholders to vote in favor of a series of merger transactions ("Merger") pursuant to which

Zynga will survive as a wholly-owned subsidiary of Take-Two Interactive Software, Inc. ("Take-Two"), in exchange for payment by Take-Two to Zynga's public stockholders ("Zynga Stockholders") of (i) $3.50 per share in cash ("Cash Portion"), and (ii) a number of shares of Take-Two equal to the exchange ratio ("Share Portion," and together with the "Cash Portion," the "Merger Consideration").[1]

2.      On January 10, 2022, Zynga announced that the Board had approved the sale of the Company to Take-Two for the Merger Consideration pursuant to a merger agreement ("Merger Agreement").

3.      On April 7, 2022, Defendants authorized the filing of a false and misleading proxy on Schedule 14A ("Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, with the aim of soliciting Zynga Stockholders to vote for the Merger and certain related proposals.

4.      The Proxy contains material misrepresentations, and material omissions that render statements misleading, including but not limited to (i) misrepresenting the "independence" of one

---

[1] Under the Merger Agreement (as defined in the next paragraph), the "Exchange Ratio" is calculated as follows: (i) if the Take-Two Common Stock Price (as defined below) is an amount greater than $181.88, then the Exchange Ratio is 0.0350; (ii) if the Take-Two Common Stock Price is an amount greater than or equal to $156.50 but less than or equal to $181.88, then the Exchange Ratio is an amount equal to the quotient (rounded to five decimal places) obtained by dividing (a) $6.36 by (b) the Take-Two Common Stock Price; and (iii) if the Take-Two Common Stock Price is less than $156.50, then the Exchange Ratio is 0.0406. "Take-Two Common Stock Price" is defined as the volume-weighted average sales price per share of Take-Two Common Stock on the Nasdaq Global Select Market for the consecutive period beginning at 9:30 a.m. New York time on the twenty-third trading day immediately preceding the closing date of the Combination and concluding at 4:00 p.m. New York time on the third trading day immediately preceding such closing date.

For example, at the close of trading on January 10, 2022—the date the Merger was announced—the closing price of Take-Two common stock was $142.99. The Exchange Ratio (i.e., the number of Take-Two shares issued per Zynga share) was thus 0.0406, and the value of the Stock Portion was $5.81 per Zynga share.

of the two members of the Strategic Committee that oversaw negotiation of the Merger; (ii) failing

to disclose the lack of "independence" of another director who played an influential role in the

negotiation of the Merger; and (iii) failing to disclose a lending relationship between an affiliate

of the Board's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") and Take-Two.

These and other material misrepresentations and omissions render the Proxy false and misleading

in violation of the above-referenced Exchange Act provisions and Rule 14a-9.

5.     The Proxy advises that a special meeting of Zynga Stockholders will be held on

May 19, 2022, to vote on the Merger and certain related proposals ("Stockholder Vote"). The

violations referenced above must be cured in advance of the Stockholder Vote to enable Zynga

Stockholders to make an informed decision concerning whether or not to vote in favor of the

Merger and related proposals. Therefore, Plaintiff seeks to enjoin the Defendant from taking any

further steps to consummate the Merger and schedule the Stockholder Vote, until such violations

are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover

damages suffered by himself and similarly-situated investors as a result of such violations.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the claims asserted herein for

violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange

Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.     This Court has personal jurisdiction over each of the Defendants because each

defendant has sufficient minimum contacts with the United States so as to make the exercise of

jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

*See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5

(S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and

Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "ZNGA" on NASDAQ, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which is headquartered in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## **PARTIES**

9.     Plaintiff is, and has been at all relevant times, a continuous stockholder of Zynga common stock.

10.    Defendant Zynga is a Delaware corporation with its principal executive offices located at 699 Eighth Street, San Francisco, California 94103.

11.    Defendant Mark Pincus ("Pincus") is Chairman of the Board and the Company's founder. He previously served as Zynga's CEO from April 2007 to July 2013, and from April 2015

to March 2016. Pincus is the largest individual shareholder of the Company with a 4.9% stake worth nearly $500 million as of mid-January 2022 shortly after the Merger was announced.

12.     Defendant Frank D. Gibeau ("Gibeau") has been Zynga's CEO since March 2016, and has served as a member of the Board at all relevant times.

13.     Defendant Regina E. Dugan ("Dugan") has served as a member of the Board at all relevant times.

14.     Defendant William "Bing" Gordon ("Gordon") has served as a member of the Board at all relevant times.

15.     Defendant Louis J. Lavigne, Jr. ("Lavigne") has served as a member of the Board at all relevant times.

16.     Defendant Carol G. Mills ("Mills") has served as a member of the Board at all relevant times.

17.     Defendant Janice M. Roberts ("Roberts") has served as a member of the Board at all relevant times.

18.     Defendant Ellen F. Siminoff ("Siminoff") has served as a member of the Board at all relevant times.

19.     Defendant Noel Watson ("Watson") has served as a member of the Board at all relevant times.

20.     Defendants identified in paragraphs 11 to 19 are collectively referred to herein as the "Individual Defendants," and together with Zynga, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Zynga's Business

21.     Zynga is a global leader in interactive entertainment with a a diverse portfolio of

popular mobile game franchises that have been downloaded more than four billion times, including *CSR Racing*, *Empires & Puzzles*, *FarmVille*, *GolfRival*, *Hair Challenge*, *Harry Potter: Puzzles & Spells*, *High Heels!*, *Merge Dragons!*, *Merge Magic!*, *Toon Blast*, *Toy Blast*, *Words With Friends*, and *Zynga Poker*.

22.     With its acquisition of Chartboost, a leading mobile advertising and monetization platform, Zynga also offers an industry-leading next-generation platform to optimize programmatic advertising and yields at scale.

**Background to the Merger**

23.     In 2021, senior Zynga executive began meeting with potential acquirers.

24.     On October 4, 2021, the Board formed a strategic committee ("Strategic Committee"), which was authorized to (i) oversee and provide assistance to Zynga management and its advisors with respect to the exploration, evaluation, consideration, review and negotiation of the terms and conditions of any strategic alternative, including any sale of Zynga; (ii) take such other actions with respect to any strategic alternative as the Strategic Committee deemed necessary, appropriate or advisable; and (iii) recommend what action, if any, that the Zynga board of directors should take with respect to any strategic alternative.

25.     The Board appointed Defendants Roberts and Siminoff to serve as the members of the Strategic Committee. The Proxy represents that Defendants Roberts and Siminoff are both "***independent*** members of the Zynga board of directors." As discussed below, that representation is false since Defendant Siminoff is not independent.

26.     On October 6, 2021, the Board approved the retention of Goldman Sachs as financial advisor, and approved the use by Goldman Sachs of long-range projections prepared by management.

27.     On October 8, 2021, Take-Two's CEO, Strauss Zelnick ("Zelnick"), had a call with Defendant Gibeau concerning Take-Two's interest in a transaction with Zynga. The pair met again on November 15, 2021.

28.     On December 6, 2021, Zelnick presented members of Zynga management with a proposal for Take-Two to combine with Zynga with each share of Zynga being exchanged for consideration with an assumed value of $9.85 per share comprised of 25% cash and 75% shares of Take-Two stock.

29.     On December 10, 2021, the Board and its advisors met with Zelnick and other senior Take-Two executives and their advisors met to discuss Take-Two's initial proposal.

30.     On December 11, 2021, the Board approved updated long-range financial projections for use by Goldman Sachs.

31.     On December 13, 2021, at a meeting with members of Zynga management, the Strategic Committee determined that the Board should meet again with Mr. Zelnick to further understand his views on the strategic rationale for a combination of Zynga with Take-Two.

32.     According to the narrative in the Proxy, however, the second meeting between the Board and Zelnick requested by the Strategic Committee never occurred. Instead, on December 17, 2021, Zelnick met with Defendants Gibeau, Siminoff, and Pincus to discuss the strategic rationale for Take-Two's proposed combination of Take-Two and Zynga. During this meeting, *for the first time*, Zelnick expressed Take-Two's willingness to expand Take-Two's board of directors to add two new members from the Zynga Board. Later on December 17, 2021, Zelnick also met with Defendant Gordon concerning the strategic rationale for a proposed combination of Take-Two and Zynga. Defendants Siminoff and Gordon—neither of whom are independent of Pincus— were subsequently the two Zynga Board members selected to join the Take-Two board of directors.

33.     On December 18, 2021, the discussions with Zelnick on December 17, 2021, were reviewed by the Strategic Committee.

34.     On December 29, 2021, the Board approved updated long-range financial projections for use by Goldman Sachs.

35.     After several rounds of negotiations, Zynga and Take-Two agreed to the Merger Consideration, including the Exchange Ratio, which serves as a "collar" to provide greater certainty concerning the value to be delivered to Zynga Stockholders.

36.     On January 9, 2022, Goldman Sachs orally presented (and later committed to writing) its fairness opinion ("Fairness Opinion") concluding that the Merger Consideration was fair, from a financial point of view, to Zynga Stockholders. Following receipt of the Fairness Opinion, the Board approved the Merger, and Zynga and Take-Two later executed the Merger Agreement.

37.     On January 10, 2022, Zynga and Take-Two announced the Merger.

38.     On February 25, 2022, Zynga announced the expiration of the "go-shop" period, and advised that Zynga did not receive an alternative acquisition proposal during such period.

**Receipt of Different Consideration by Officers and Directors**

39.     The Proxy acknowledges that certain of Zynga's directors and executive officers "may have interests in the [Merger], including financial interests, which may be different from, or in addition to" the interests of Zynga Stockholders, generally," and purports to identify those differing and additional interests.

40.     First, as noted, Defendants Gordon and Siminoff will be appointed to the Take-Two board of directors.

41.     Second, the Proxy discloses that the Individual Defendants stand to earn hundreds of millions of dollars in cash from the Cash Portion of the Merger Consideration—including approximately *$194 million* in cash to be paid to Defendant Pincus from the Cash Portion of the Merger Consideration—as per the following table in the Proxy showing the equity interests of Zynga officers and directors:

| Name | Shares of Zynga Common Stock (#)(1) | Shares of Zynga Common Stock ($) | Zynga Options (#)(2)(3) | Zynga Options ($) | Zynga RSUs and PSUs (#)(3)(4)(5)(6) | Zynga RSUs and PSUs ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Frank Gibeau | 1,727,388 | 15,546,492 | 8,746,966 | 47,908,061 | 3,985,717 | 35,871,453 | 99,326,006 |
| James Gerard Griffin | 745,010 | 6,705,090 | 4,055,912 | 21,541,389 | 1,907,657 | 17,168,913 | 45,415,392 |
| Bernard Kim | 1,203,914 | 10,835,226 | 6,555,912 | 37,861,389 | 2,063,899 | 18,575,091 | 67,271,706 |
| Phuong Y. Phillips | 421,686 | 3,795,174 | 1,059,494 | 4,421,516 | 684,294 | 6,158,646 | 14,375,336 |
| Amy Rawlings (7) | 179,884 | 1,618,956 | 0 | 0 | 110,593 | 995,337 | 2,614,293 |
| Jeff Ryan | 114,641 | 1,031,769 | 468,816 | 1,678,462 | 612,540 | 5,512,860 | 8,223,091 |
| Matthew S. Bromberg (8) | 985,829 | 8,872,461 | 278,599 | 998,897 | — | — | 9,871,358 |
| Dr. Regina E. Dugan | 234,046 | 2,106,414 | — | — | — | — | 2,106,414 |
| William "Bing" Gordon (9) | 1,318,913 | 11,870,217 | — | — | 9,616 | 86,544 | 11,956,761 |
| Louis J. Lavigne, Jr. | 284,064 | 2,556,576 | — | — | — | — | 2,556,576 |
| Carol G. Mills | 233,872 | 2,104,848 | — | — | — | — | 2,104,848 |
| Mark Pincus | 55,414,847 | 498,733,623 | — | — | — | — | 498,733,623 |
| Janice M. Roberts | 233,872 | 2,104,848 | — | — | — | — | 2,104,848 |
| Ellen F. Siminoff | 220,572 | 1,985,148 | — | — | — | — | 1,985,148 |
| Noel B. Watson, Jr. | 40,857 | 367,713 | — | — | — | — | 367,713 |

## The Proxy Contains Material Misrepresentations and Omissions

42.     Defendants disseminated a false and misleading Proxy to Zynga Stockholders that misrepresents material facts, and omits material information necessary for Zynga Stockholders to make an informed decision concerning whether to vote for the Merger.

### *False and Misleading Statement Regarding the Purported "Independence" of Defendant Siminoff (One of Two Members of the Strategic Committee)*

43.     As noted, Defendant Siminoff was one of only two members of the Strategic Committee formed by the Board to undertake the critical tasks of overseeing negotiation of the Merger and making recommendations to the Board. When recounting Siminoff's appointment to the Strategic Committee, the Proxy states that Siminoff is "independent," but that statement was false and must be corrected.

44.     Independence with respect to a particular business matter means that a director's decision with respect to such matter will be based solely on the merits rather than on extraneous considerations or influences. In a 2016 decision, the Delaware Supreme Court held that Defendant Siminoff was not independent of Defendant Pincus because of an "extremely close" personal friendship between them and their families (including co-ownership of a private plane) that rendered Siminoff incapable of impartially considering matters affecting Pincus. *Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016).

45.     Based on the *Sandys* decision, the statement in the Proxy that Siminoff is "independent" in connection with negotiating the Merger is false given that (i) the Delaware Supreme Court has found that Siminoff cannot impartially consider matters affecting Pincus, and (ii) Pincus is the single largest individual beneficiary of the Merger with an expected cash payout of approximately *$194 million*.

46.     Moreover, the narrative in the Proxy suggests that the close friendship between Siminoff and Pincus still exists, and influenced decision making with respect to the Merger. In particular, given that Pincus is currently Chairman of the Board, and Zynga's largest individual shareholder, it is quite suspect that his close friend Siminoff was appointed as one of only two members of the Strategic Committee charged with overseeing negotiation of the Merger, despite the Delaware Court's well-known holding that Siminoff is not independent of Pincus, and the availability of other highly qualified Board members who are independent of Pincus to serve on the Strategic Committee.

47.     It is reasonable to infer that Pincus wanted Siminoff appointed to the Strategic Committee so he would have better intelligence in terms of the progress of negotiations and more influence over the process. Those motives emerge from a highly unusual sequence of events

described in the Proxy. On December 13, 2021, the Strategic Committee determined that the Board should meet again with Zelnick to further understand his views on the strategic rationale for a combination of Zynga with Take-Two. But that second meeting apparently never occurred. Instead, on December 17, 2021, Zelnick met with Defendants Gibeau, *Siminoff*, and *Pincus* to discuss the strategic rationale for Take-Two's proposed combination of Take-Two and Zynga— the very subject Zelnick was supposed to discuss again with the *entire* Board.

48.     Moreover, during the December 17 meeting with Pincus, Siminoff and Gibeau, Zelnick expressed *for the first time* Take-Two's willingness to expand Take-Two's board to add two new members from the Zynga Board. And then lo and behold, Siminoff was one of the two Zynga Board members selected to join the Take-Two board. Pincus was clearly looking out for Siminoff, and thus it is reasonable to conclude that Siminoff could not consider the merits of the Merger impartially without extraneous influence from Pincus.

49.     The independence of fiduciaries negotiating the sale of a public company on behalf of its public shareholders is a material consideration for such shareholders. Based on the narrative in the Proxy, it is plain that Pincus remains an extraneous influence affecting Siminoff's ability to impartially consider business matters affecting Pincus exclusively on their merits. As such, the statement in the Proxy that Siminoff is independent in connection with the Merger is false and must be corrected.

### *Material Omission Concerning the Lack of Independence of Defendant Gordon from Defendant Pincus*

50.     The Delaware Supreme Court's decision in *Sandys* also found that Defendant Gordon was not independent of Defendant Pincus because, as a partner at venture capital firm Kleiner Perkins, Gordon enjoyed a mutually beneficial ongoing business relationship with Pincus with respect to new investment opportunities.  *Sandys*, 152 A.3d at 134.

51.     The Proxy indicates that Gordon played an influential role in negotiating the Merger. After the December 17 meeting with Pincus, Siminoff and Gibeau, Zelnick spoke with Gordon about the strategic rationale for Take-Two's proposed combination of Take-Two and Zynga—the very subject Zelnick was supposed to discuss again with the *entire* Board.

52.     Moreover, as noted, during the December 17 meeting with Pincus, Siminoff and Gibeau, Zelnick expressed *for the first time* Take-Two's willingness to expand Take-Two's board to add two new members from the Zynga Board. And then lo and behold, Gordon was the other Zynga Board member (in addition to Siminoff) selected to join the Take-Two board. Pincus was clearly looking out for Gordon, and thus it is reasonable to conclude that Gordon could not consider the merits of the Merger impartially without any extraneous influence from Pincus.

53.     The independence of fiduciaries negotiating the sale of a public company on behalf of its public shareholders is a material consideration for such shareholders. Accordingly, the prior mutually beneficial business relationships between Pincus and Gordon must be disclosed to Zynga Stockholders to allow them to weigh the significance of those relationships when deciding how to vote with respect to the Merger.

### *Material Omissions Concerning the Lending Relationship Between Goldman Sachs and Take-Two*

54.     Concerning any prior relationships between Goldman Sachs and Take-Two and its affiliates, the Proxy makes the following disclosure: "During the two year period ended March 4, 2022, *the Investment Banking Division* of Goldman Sachs has not been engaged by Take–Two or its affiliates to provide financial advisory or underwriting services for which Goldman Sachs has recognized compensation." This statement omits material facts that must be disclosed in order to make the statement not misleading.

55.    A reasonable investor would take from the statement above that Goldman Sachs did not have any relationship with Take-Two that could pose a conflict. But while the "Investment Banking Division" of Goldman Sachs may not have provided "financial advisory or underwriting services" to Take-Two during the two years prior to March 4, 2022, the Proxy fails to disclose that a Goldman Sachs affiliate, Goldman Sachs Bank USA, N.A. ("Goldman Sachs Bank"), provided a material lending commitment to Take-Two during that timeframe. Specifically, on June 28, 2021, Take-Two and Goldman Sachs Bank signed a "First Amendment to Credit Agreement and Incremental Amendment" ("June 2021 Credit Agreement") under which Goldman Sachs Bank agreed to serve as an incremental lender and commit an additional $50 million to the $200 million in revolving credit originally committed under an earlier Credit Agreement dated February 8, 2019 with other lenders. Goldman Sachs Bank's $50 million commitment raised the aggregate revolving credit commitment to Take-Two to $250 million.

56.    The June 2021 Credit Agreement reflects that Take-Two paid fees to Goldman Sachs Bank in connection with the $50 million increase in the revolving credit commitment.

57.    The increased lending commitment made by Goldman Sachs was material, as evidenced by its disclosure in Take-Two's Form 10-Q filed on August 2, 2021 as follows:

> On February 8, 2019, we entered into an unsecured Credit Agreement, **and on June 28, 2021**, we amended our unsecured Credit Agreement solely to increase the commitments under the facility by [$50 million] (as amended, the "Credit Agreement") that runs through February 8, 2024. The Credit Agreement provides for an unsecured five-year revolving credit facility with commitments of [$250 million].

58.    Goldman Sachs Bank and Take-Two entered into the June 2021 Credit Agreement less than nine months before March 4, 2022, and therefore the June 2021 Credit Agreement must be disclosed so that the statement in the Proxy quoted in paragraph 54 is not misleading.

59.     In particular, information that bears on whether a financial advisor faces conflicts of interest is material to stockholders when deciding how to vote on a merger. Here, because (i) Goldman Sachs played a highly active role in negotiating the Merger, and (ii) the Board's decision to approve the Merger and to recommend that Zynga Stockholders vote to approve the Merger was based in part on the Fairness Opinion, any conflicts Goldman Sachs had that might have (i) predisposed it to favor Take-Two in some manner, and (ii) prevented it from providing unbiased advice to the Board concerning the fairness of the Merger Consideration, would be material to the decision of Zynga Stockholders of whether to vote in favor of the Merger.

60.     To help them determine whether to vote in favor of the Merger, Zynga Stockholders are entitled to full disclosure of the June 2021 Credit Agreement and confirmation of the compensation earned by Goldman Sachs Bank thereon, to enable them to evaluate whether the June 2021 Credit Agreement created a conflict of interest material enough to taint the reliability of the Financial Opinion and otherwise negatively affect the ability of Goldman Sachs to provide unbiased advice to the Board.

### *The Goldman Sachs Fairness Opinion is False and Misleading*

61.     The Fairness Opinion included in the Proxy improperly fails to disclose certain key inputs and assumptions underlying the analyses on which it was based, which renders it false and misleading. Without this information, as described below, Zynga Stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Fairness Opinion in determining whether to vote for the Merger. This omitted information, if disclosed, would significantly alter the total mix of information

62.     With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis— Zynga Standalone*, the Proxy fails to adequately disclose how Goldman Sachs determined that a

discount rate range of 6.0% to 8.0% was appropriate. The explanation that the discount rate range reflects "estimates of Zynga's weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, beta adjustments and other inputs that Goldman Sachs used to derive that range.

63.     Likewise, in Goldman Sachs's *Illustrative Discounted Cash Flow Analysis— Combined Company*, the Proxy fails to adequately disclose how Goldman Sachs determined that a discount rate range of 5.0% to 7.0% was appropriate. The explanation that the discount rate range reflects "estimates of the pro forma combined company's weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments and other inputs that Goldman Sachs used to derive that range.

64.     If the discount rate ranges used by Goldman Sachs in its discounted cash flow analyses were artificially high it would have depressed the value ranges generated, and created the impression that the Merger Consideration was fair when it was not. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). Zynga Stockholders are entitled to further disclosure concerning the inputs Goldman Sachs used to derive its discount rate range. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them."). Such information is material since a discounted cash flow analysis is "arguably the most important valuation metric." *Laborers Loc. 235 Benefit Funds v. Starent Networks, Corp.*, No. CIV.A. 5002-CC, 2009 WL 4725866, at *1 (Del. Ch. Nov. 18, 2009).

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants
### for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

65.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

66.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

67.     Defendants disseminated the false and misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

68.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

69.     Yet, as specified in paragraphs 42-64 above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy,

and (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Zynga Stockholders to vote in favor of the Merger and related proposals. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

70.     The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Zynga Stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Zynga Stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Zynga Stockholders.

71.     Because of the material misrepresentations and omissions in the Proxy specified above, Plaintiff and other Zynga Stockholders are threatened with irreparable harm insofar as Plaintiff and other Zynga Stockholders will be deprived of their entitlement to make a fully informed decision as to how to vote on the Merger and related proposals if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

72.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

73.     The Individual Defendants acted as controlling persons of Zynga within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Zynga, and participation in, and/or awareness of Zynga's operations,

17

and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Zynga with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

74.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.    Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Zynga Stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

76.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Proxy.

77.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

78.    As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

79.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict, and can Plaintiff and other Zynga Stockholders make an informed decision about whether to vote for the Merger.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Zynga Stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages;

C.     Directing Defendants to account to Plaintiff for all damages suffered as a result of their misconduct;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: April 13, 2022            **WOHL & FRUCHTER LLP**


By:/s *Joshua E. Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*